**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**

FILED
2008 Aug 25 PM 04:32
CLERK U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
TOLEDO



Mary Ann Whipple
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No.: 03-39184 |
| | ) | |
| Gerlinger, Inc., | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Adv. Pro. No. 05-3407 |
| | ) | |
| Wayne Walker, Trustee, | ) | Hon. Mary Ann Whipple |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| Motivation Consultants, Inc., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### MEMORANDUM OF DECISION

Plaintiff Wayne Walker ("Plaintiff"), Trustee of the Liquidating Trust established under Debtor Gerlinger, Inc.'s ("Gerlinger") confirmed Chapter 11 plan, filed a complaint seeking to avoid under 11 U.S.C. § 549(a) unauthorized post-petition transfers in the amount of $66,506.44 that Gerlinger made to Defendant Motivation Consultants, Inc. ("Motivation") and to recover those transfers under 11 U.S.C. § 550. The court previously granted Plaintiff summary judgment on his avoidance claim in Count I. This

adversary proceeding is now before the court for decision after trial on Plaintiff's claim for recovery in Count II of the complaint.

The court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §1334(b) as a civil proceeding arising under title 11and arising in a case under title 11. This proceeding has been referred to this court by the district court under its general order of reference. 28 U.S.C. § 157(a); General Order 84-1 of the United States District Court for the Northern District of Ohio. Proceedings to recover unauthorized post-petition transfers are core proceedings that the court may hear and decide. 28 U.S.C. § 157(b)(1) and (b)(2)(O).

This Memorandum of Decision constitutes the court's findings of fact and conclusions of law under Fed. R. Civ. P. 52, made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052. Regardless of whether specifically referred to in this Memorandum of Decision, the court has examined the submitted materials, weighed the credibility of the witnesses, considered all of the evidence, and reviewed the entire record of the case. Based upon that review, and for the reasons discussed below, the court finds that Plaintiff is entitled to judgment in his favor on his claim for recovery in the amount of $6,506.44.

## **FINDINGS OF FACT**[1]

Gerlinger was a floor coverings wholesaler and distributor. As part of its marketing and customer loyalty programs, Gerlinger's customers were offered incentive travel programs, a widely used marketing tool in the flooring industry that constituted the major focus of Gerlinger's marketing efforts. Gerlinger's customers accumulated points based on their purchases by electing to purchase product at promotional pricing that added to the regular purchase price a specified amount per unit of product purchased. In addition, customers accumulated points through Gerlinger's contribution of one percent of total sales to a customer's promotional account. A system, referred to as the promotional accounts balance, was used whereby accumulated points for each customer were tracked by Gerlinger through a computer program and

---

[1] In its Memorandum of Decision and Order denying the parties' cross-motions for summary judgment, the court set forth in some detail the facts it found were not in dispute. [Doc. # 24, pp. 2-10]. Under Federal Rule of Civil Procedure 56(d), made applicable in this proceeding by Federal Rule of Bankruptcy Procedure 7056, "[t]he facts so specified must be treated as established in the action." The court will include in this opinion those undisputed facts to the extent relevant to the issues that remained for trial. Also, in addition to the testimony and documentary evidence offered at trial, the court takes judicial notice of the contents of its case docket in this proceeding and in the underlying Chapter 11 case, *In re Gerlinger, Inc.*, Case No. 03-39184, pursuant to Plaintiff's unopposed request. Fed. R. Bankr. P. 9017; Fed. R. Evid. 201(b)(2); *In re Calder*, 907 F.2d 953, 955 n.2 (10th Cir. 1990); *St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1171-72 (6th Cir. 1979) (stating that judicial notice is particularly applicable to the court's own records of litigation closely related to the case before it).

a monthly statement was mailed to customers showing the points accumulated toward their incentive travel objective.

Motivation, owned by father and son, Enos and John Gleason, is in the travel incentive program business. Gerlinger, one of Motivation's first clients, had contracted with Motivation to plan and operate its customer incentive trips. Motivation has handled the majority of Gerlinger's marketing for nearly twenty-five years.

The contract involved in this adversary proceeding was entered into between Gerlinger and Motivation on December 3, 2002. [Pl. Ex. 1]. The contract provided that Motivation would plan and operate for Gerlinger's representatives and customers a trip to Disney World in Orlando, Florida plus a Disney cruise ("Disney trip"), to occur from February 19-26, 2004. The contract outlined the land and sea trip specifications as well as the services Motivation would provide. Gerlinger's obligation under the contract was to work with its customers accumulating point totals for generating trip participants and to pay for the trip. The contract outlined trip cost on a per participant basis, which included Motivation's projected profit of $75 per participant with respect to the land portion of the trip and $180 per participant with respect to the cruise portion. The contract stated that "[a] payment schedule for all trips has been established," without specifying what that schedule is, and that "[a] final progress payment for the balance shall be paid on December 22, 2003." [*Id.* at § III(A)]. The contract also addressed cancellation issues, providing that if Gerlinger failed to make all of the prescribed progress payments or if it cancelled the travel arrangements made under the agreement by written notice received by Motivation no later than 120 days before the departure date, Motivation would refund to Gerlinger all funds paid by it under the agreement, less any applicable penalties imposed by vendors plus any out-of-pocket expenses already incurred by Motivation. The contract further provided that if Gerlinger cancelled the travel arrangements less than 120 days before departure, Motivation was also entitled to retain $100 per person that was to participate in the travel program.

Although the contract document did not contain a specific progress payment schedule for the Disney trip, Enos Gleason, an officer and one of the owners of Motivation, sent a letter dated January 29, 2003, to Gary J. Garris ("Garris"), President and CEO of Gerlinger, setting out a payment plan that covered the Disney trip as well as four other travel incentive programs. The payment plan called for 48 weekly payments of $14,000 starting in February 2003 and then a final invoice for each trip. The letter explained:

One of the "tight ropes" that we try to walk when preparing a payment schedule as such is

3

> to use a number that is not unrealistically high, but to use a number that is realistic enough that you are not left with an enormous invoice due just prior to a trips operation. To that end, we have based a payment schedule on very conservative numbers, recognizing that this year we are off to a slow start.

[Pl. Ex. 2, p. 1]. Motivation also developed a spreadsheet setting forth the amount of the payments and allocating a specified amount of each payment to each of the five planned travel programs. [*See id.* at 2].[2]

Gerlinger immediately commenced payments under this plan, submitting checks to Motivation in the amount of $14,000 on February 3 and 7, 2003, and thereafter nine additional payments of $14,000 on a weekly basis through April 10, 2003, each payment resulting in a $2,223.35 credit to the Disney travel program. Before the first payment on February 3, 2003, Motivation had already incurred $12,119.76 in expenses relating to the Disney trip. [*See* Def. Ex. P, p.1]. By March 27, 2003, Motivation had recouped its initial outlay of funds, leaving a $1,220.34 balance with respect to the Disney trip. Although Gerlinger stopped making regular weekly payments after April 10, 2003, it made payments on May 20 and June 4, 2003, and $2,223.35 of each payment was credited to the Disney trip, leaving a balance of $11,310.59. Further Disney trip expenses were not incurred by Motivation until an October 2, 2003, expense in the amount of $556.58. [*See* Def. Ex. P, p. 1].

In the meantime, Gerlinger was experiencing financial difficulties. According to John Gleason, President of Motivation, he was aware of Gerlinger's financial issues. In a letter to Garris dated August 1, 2003, Enos Gleason noted that eight weekly payments totaling $112,000 had not been made by Gerlinger and suggested that larger weekly payments of $18,000 be made starting September 1, 2003. [Pl. Ex. 6]. The letter stated that Motivation had modified the payment spreadsheet by changing the number of participants on each of the planned travel programs "to a more realistic level." [*Id.*]. The spreadsheet attached to the August 1 letter shows that the total cost for the Disney trip at that point was $159,503.40, of which $24,456.85 had been paid, and it reallocates future payments to each of the travel programs.

Gerlinger failed to meet Motivation's revised payment schedule. On October 9, 2003, Enos Gleason wrote Garris a letter assuming yet another decrease in the trip participation numbers and costs. [Pl. Ex. 7]. At that time, only two trips remained in the planning stage, two trips having already been completed and

---

[2] The spreadsheet provides for monthly payments of $56,000, but, at the request of Gerlinger, payments were to be made on a weekly rather than monthly basis. Thus, the letter explains that the "'flat payment' of $56,000.00 per month equates to $14,000.00 per week for the next 48 weeks. . . ." [Pl. Ex. 2, p.1].

4

one trip having been cancelled. Funds that had been allocated to the cancelled trip were applied by Motivation towards one of the two trips that were completed in August or September 2003. The spreadsheet attached to the October 9 letter showed the total reduced Disney trip cost of $100,582.88, of which the same $24,456.85 in payments as referenced in the August 1 letter had been received and allocated to that trip. Gleason states in the letter that "I plugged a $50,000 per month figure in for the next three months, as we need to start getting these payments caught up in the very near future" and that "[w]e are at a point now with both Disney and the Renaissance that they are threatening cancellation if the progress payments are not resumed." [*Id.*]. In the attached spreadsheet, Motivation allocates to the Disney trip $20,000 of the new monthly payment amount for the months of October, November and December 2003 and sets forth a final payment of $16,126.03 that would be due in January 2004.

In a letter to Garris dated October 22, 2003, John Gleason stated that "only token payments" had been made on the remaining two travel programs and that "[w]e have exhausted our favors from all of the suppliers involved." [Pl. Ex. 9]. The letter set forth in detail the payments required for the Disney trip and the dates by which those payments must be made. Gleason stated that the "dates are hard, firm dates that must be met or our suppliers will simply cancel space, impose harsh cancellation penalties, and we will all have severe problems with which to deal." [*Id.*, p. 2]. Gleason testified that one of the suppliers referred to in his October 22 letter was Disney Cruise Vacations with whom Motivation had contracted. The contract was signed by John Gleason as Vice President of Motivation and not as agent for Gerlinger. [*See* Pl. Ex. 37]. Gleason explained that Gerlinger was not a party to that contract and that Motivation was directly responsible for payments under the contract.

Gerlinger filed its petition for relief under Chapter 11 of the Bankruptcy Code on November 13, 2003. Immediately before filing its petition, Gerlinger entered into an Asset Purchase Agreement ("the Agreement") dated November 12, 2003, with CDC Distributors, Inc. ("CDC"). [Pl. Ex. 29]. During the negotiation of the Agreement, which began in September 2003, Gerlinger and CDC met with and had frequent discussions with National City Bank ("National City"), which held a security interest in all of Gerlinger's assets. Like Gerlinger, CDC is a floor coverings wholesaler and was familiar with and used incentive travel programs as a marketing tool. Alan Futscher, Chief Financial Officer for CDC, testified that CDC became familiar with Gerlinger's travel incentive programs, including the Disney trip, in performing its due diligence with respect to the Agreement and that if the trip had been cancelled, CDC would have viewed the cancellation as lost customers. According to Futscher, Gerlinger was required to

5

do whatever was necessary to maintain relations with its customers.

Under the Agreement, CDC agreed to buy Gerlinger's assets, subject to certain exclusions including cash, for a total maximum purchase price of $3.6 million. The purchase price was subject to certain adjustments, including an adjustment for variation from a specified target for accounts receivable. Specifically, the Agreement provided that if eligible accounts receivable, as defined in the Agreement, were less than $1.9 million at the time of the closing, the purchase price was to be decreased dollar for dollar for the difference. [*Id.* at ¶ 4(a)]. The Agreement defines "eligible accounts receivable" as being "trade accounts receivable . . . decreased by customer promotional accounts. . . ." [*Id.* at ¶ 4]. Thus, if the trade accounts receivable totaled less than $1.9 million, any reduction in the customer promotional account by payment to Motivation would result in a higher purchase price. The Agreement required Gerlinger to commence a Chapter 11 case and the sale of assets was conditioned on bankruptcy court approval.

Along with its bankruptcy petition filed on November 13, 2003, Gerlinger also filed an expedited motion seeking authority to use cash collateral and enter into a post-petition financing agreement with National City so as to provide sufficient financing to continue operations until the CDC sale could be considered and consummated if approved by the court. The First Cash Collateral Order provided borrowing and cash collateral authority through December 6, 2003. The court held a further cash collateral hearing on December 5, 2003, and entered the Second Interim Consent Order Granting Authority for Use of Cash Collateral and Post-Petition Financing ("Second Cash Collateral Order"). [Doc. #41, Case No. 03-39184]. As it did in the First Cash Collateral Order, the court permitted use of cash collateral only in conformity with the attached projected budget and such other expenses as may be agreed upon by Gerlinger and National City in writing as necessary to continuation of the business. [*Id.* at ¶ 5]. The projected budget for the four weeks ending December 13, 2003, through January 3, 2004, included categories of disbursements that were the same as the projected budget under the First Cash Collateral Order with one significant difference: a line item category was added for and labeled as "Promotional expenses." [*Id.*, Ex. A, p. 2]. The budgeted amounts for "Promotional expenses" were $15,000 per week for each of the four weeks. Motivation was not identified by name in the projected budget. The cash collateral authority granted extended through January 7, 2004.

Gerlinger's attorney and the newly engaged attorney for the Unsecured Creditors' Committee were not aware of the identity of the payee or the intended use of the funds to pay for a Disney Trip scheduled for February 2004. As represented in his affidavit on summary judgment, Gerlinger's attorney was not even

6

aware of Gerlinger's December 2002 contract with Motivation for the Disney trip and understood that all of the expenses set forth in the projected budget were for current business operating expenses necessary to keep the business going prior to the sale to CDC.[3] [Pl. Ex. 18]. That Gerlinger's attorney lacked any knowledge of the December 2002 contract is buttressed by the fact that the contract does not appear on Gerlinger's Schedule G - Executory Contracts and Unexpired Leases filed with its bankruptcy petition. [Case No. 03-39184, Doc. # 1, Schedule G].

In a letter faxed to Garris on December 5, 2003, John Gleason describes the cancellation penalties that *Motivation* would incur from Disney, at that point in the amount of $405 per person, escalating to full cost as of December 19, 2003. [Plf Ex. 13]. Gleason testified that, before December 19, any cancellation fees that would have been incurred if Gerlinger had failed to make the required payments and the Disney trip was cancelled would have been covered by the deposits already made by Gerlinger. However, after that date, the cancellation fees would exceed the deposits made by Gerlinger. In a fax transmission to Motivation on the same date, Garris informed Motivation that "[o]ur submitted budget for the next 4 weeks (*including Disney promo*) has been approved. Steve [Lagrou, Gerlinger's Chief Operating Officer,] will be making payments to you overnighted over the next ten days to meet our Dec. 19 deadline." [Pl. Ex. 16 (emphasis added)]. Garris also faxed Motivation a copy of the budget that included the line item "Promotional expenses" and that was approved by the court on December 5, 2003. Garris testified that he knew Motivation would rely on these communications and Motivation, in fact, did rely on them in proceeding with the Disney trip plans. In response to a December 15, 2003, email from a Disney Cruise Vacations representative to Gleason stating "an expectation that *Motivational Consulting* will pay Disney Cruise Vacations $15,000 every week . . . for the next 4 weeks," [*See* Pl. Ex. 31 (emphasis added)], Gleason states,

> As we discussed, the first payment is here. They also sent us a copy of the bankruptcy "budget" as approved by the judge and trustee, and we are budgeted for the next three weeks, so I see no problem. I will have Rob Gleason get the names etc. to you a.s.a.p., so we can

---

[3] The court found these facts to be undisputed on summary judgment. As noted above, under Rule 56(d), such facts are treated as established in the case. *See* Fed. R. Civ. P. 56(d); 10 Alan N. Resnick, et al., Collier on Bankruptcy ¶ 7056.06 (15th ed. revised 2007) ("until and unless the determination is reconsidered, any facts determined by the court to be not in controversy are then established for the trial"). Although Garris testified at trial that he disputes the affidavit of Gerlinger's attorney that was submitted on summary judgment because he discussed Gerlinger's travel programs with Gerlinger's attorney before the bankruptcy petition was filed, his testimony does not contradict counsel's statements in the affidavit that he was not aware of the intended use of budgeted amounts labeled "Promotional expenses" and that he was not aware of the December 22, 2002, contract with Motivation for the Disney trip.

7

work with a more finite number on the fourth and final payment, but from what I can see, it should be about taken care of after three.

[*Id.*].

Garris testified that whether or not the Disney trip would be cancelled was a major issue with CDC and that he believed the CDC Asset Purchase Agreement could have fallen through if the trip had been cancelled. Therefore, after the Second Cash Collateral Order was entered on December 5, 2003, Gerlinger paid Motivation with three checks dated December 11, 19 and 23, 2003, each in the amount of $15,000, and a final check dated December 31, 2003, in the amount of $21,506.44. [Plf. Ex. 24]. The fourth check exceeded the cash collateral budget amount and was issued in response to Gleason's December 18, 2003, letter with an accompanying invoice for $6,506.44, reporting that the "$60,000 in payments do not quite cover the entire program cost." [Plf. Ex. 23]. Motivation never sought verification that the bankruptcy court had approved a payment in excess of the previously approved cash collateral budget. The four December 2003 checks (collectively "the Payments") represent the four transfers that Plaintiff now seeks to recover.

Motivation deposited three of the December checks received from Gerlinger into its general checking account and one of the $15,000 checks into its money market account. [*See* Pl. Exs. 33-35]. John Gleason testified that he decided into which account the checks would be deposited. According to Gleason, he tried to maintain a balance in the general checking account sufficient to satisfy Motivation's obligations for its clients' travel programs and any excess funds were then deposited into the money market account. Following the deposit of the Payments, various Disney trip expenses were paid, including $15,000 payments to Disney Cruise Vacations on December 18 and 23, 2003, both of which were paid within one day of receiving a $15,000 payment from Gerlinger. Various other expenses were paid on a pre-trip basis between January 9, and February 19, 2004, while a number of expenses were paid after the Disney trip had taken place, including a $12,949.04 expense for air fares charged to an American Express account, expenses charged to a Diners Club account, and postage expenses. [*See* Def. Ex. P]. Motivation's profit on the total amount paid with respect to the Disney trip was $18,728.33.

In the meantime, proceedings in the Chapter 11 case focused on the sale of Gerlinger's assets to CDC under the Asset Purchase Agreement. On December 17, 2003, after the appointment of the Unsecured Creditors' Committee, Debtor filed a motion to modify the original sale motion filed one month earlier. [Doc. #55, Case No. 03-39184]. Asserting that no other potential buyers had come forward, Gerlinger and the Unsecured Creditors' Committee agreed that "the best and highest price for the assets will be achieved

8

through a sale to CDC under the APA...on or before December 30, 2003." [*Id.*, ¶ 4, p.4]. Furthermore, Gerlinger, the Unsecured Creditors' Committee and National City agreed to and proposed a "carve out" from the purchase price in the total amount of $325,000, $170,000 for administrative expenses and $155,000 for the unsecured creditors. [*Id.*, ¶ 5, p.4]. After notice and a hearing, the court approved the sale to CDC on December 23, 2003, as set forth in the December 17 motion, including the negotiated carve outs. [Doc. #68, Case No. 03-39184]. Although no report of sale was ever filed with the court as required by Federal Rule of Bankruptcy Procedure 6004(f)(1), the sale of Gerlinger's assets to CDC closed on January 2, 2004. [Plf. Ex. 30]. Since trade accounts receivable totaled less than $1.9 million at the time of closing, the purchase price was decreased dollar for dollar by the amount of the entire promotional account balance. [*See* Def. Ex. F & G]. After this adjustment and other adjustments to price in accordance with the Agreement, as well as minor deductions for taxes, the net sales proceeds were $2,078,820. [*Id.*]. The net proceeds were distributed as follows: $100,00 to the CDC Claims reserve, $170,000 to the estate administration escrow, $155,000 to the unsecured creditors' carve out and $1,653,820 to National City.[4]

The Disney trip occurred in February 2004. Although there was no more Gerlinger business by that time as a result of the sale of its assets to CDC, Garris and Lagrou, who both went to work for CDC after the sale, attended the trip on behalf of CDC as part of its marketing efforts.

In early 2005 Gerlinger filed a plan of liquidation and various amended disclosure statements to wind up the estate. The second amended disclosure statement was approved for dissemination to creditors on March 2, 2005. [Case No. 03-39184, Doc. #291]. The plan was confirmed on April 20, 2005. [*Id.,* Doc. #306]. The plan provided for the creation of a Liquidation Trust to which all of Gerlinger's remaining assets, including preserved causes of action, were transferred on the effective date of the plan. The cause of action against Motivation was specifically identified in the approved disclosure statement. [*Id.,* Doc. #289, § V.C.2]. Plaintiff was appointed as the Trustee of the Liquidating Trust established under the plan and is responsible for distributing Gerlinger's remaining assets to holders of allowed claims in accordance with the plan. The confirmed plan provides that "[o]n the effective date, the Debtor shall transmit to the Trustee all Cash in its accounts for deposit by the Trustee into the Operating Account." [*Id.,* Doc. # 275, ¶ 3.1]. It further provides that "[p]roceeds in the Operating Account and funds thereafter deposited into the Operating Account from the further liquidation of the Assets, including . . . collections from any Causes of

---

[4] The payment to National City did not satisfy the debt owed by Gerlinger under the promissory note that was the basis for the bank's security interest in Gerlinger's assets. National City, therefore, pursued a claim in state court against the two guarantors of the obligations of Gerlinger to the bank and obtained a judgment against them in the amount of $304,916.51. [*See* Def. Ex. H & I]. The guarantors later settled the claims against them for a total payment of $105,000. [Def. Ex. J].

9

Action" shall be used by the Trustee to pay allowed claims in the priority set forth therein. [*Id.*]. The plan defines an "allowed" claim to include a claim for which a proof of claim was not filed if the claim "was listed in the Schedules as neither disputed, contingent nor unliquidated" and to which a timely objection has not been filed. [*Id.* at § 1.2(c)]. In such case, the allowed amount of the claim is the amount so scheduled. [*Id.*]. National City has not filed a proof of claim as to any secured claim that it might hold; however, its claim scheduled in the amount of $3,078,232 was not scheduled as disputed, contingent or unliquidated and no objection to the claim has been filed. [*See id.*, Doc. # 9, Schedule D]. It therefore had an allowed claim in the scheduled amount.

Plaintiff, in his capacity as Trustee of the Liquidating Trust created under the confirmed plan, filed his complaint against Motivation under 11 U.S.C. §§ 549(a) and 550(a), seeking avoidance and recovery of the four December 2003 transfers to Motivation in the amount of $66,506.44. On August 10, 2007, the court granted Plaintiff summary judgment on his avoidance claim under § 549(a), finding that the post-petition transfers were unauthorized. The issue now before the court is whether Plaintiff can recover the avoided transfers under § 550.

## LAW AND ANALYSIS

Section 550(a) provides as follows:

Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from--
    (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
    (2) any immediate or mediate transferee of such initial transferee.

A transfer must be avoided, as the court has previously determined is appropriate under § 549 with respect to the transfers effected by the Payments, before the recovery of its value can occur under § 550. Avoidance and recovery, however, are independent remedies and "must be kept analytically separate." *Taunt v. Hurtado (In re Hurtado)*, 342 F.3d 528, 532 (6th Cir. 2003); *see Suhar v. Burns (In re Burns)*, 322 F.3d 421, 427-29 (6th Cir. 2003).

Although the complaint alleges that Motivation is either an initial transferee or an immediate or mediate transferee, at trial Plaintiff proceeded under § 550(a)(1), arguing that Motivation is an initial transferee from whom the Payments may be recovered. There is no question that the Payments were transferred by Gerlinger directly to Motivation. However, Motivation raises three defenses. First, it argues that Plaintiff lacks standing to recover the Payments because the bankruptcy estate was not diminished by

the Payments and because any recovery will benefit only National City. It also argues that it was a "mere conduit" of the Payments from Gerlinger and, therefore, cannot be an "initial transferee" under § 550(a)(1). Finally, it argues that Plaintiff should be equitably estopped from obtaining recovery of the Payments due to certain misrepresentations made by Garris. Although the court finds that Plaintiff has standing and that Motivation is an "initial transferee," it agrees, at least as to a portion of the Payments, that equitable estoppel should preclude Plaintiff's recovery in this case.

**I. Standing**

There is no dispute that Plaintiff is the duly appointed trustee of the Liquidating Trust created in accordance with Gerlinger's Chapter 11 plan and, on the effective date of the plan, became the appointed representative of the bankruptcy estate in accordance with 11 U.S.C.§ 1123(b)(3). And there is no dispute that Plaintiff was authorized under the plan to prosecute those causes of action that he deemed to be appropriate, and specifically claims against Motivation, "for the benefit of holder's of Allowed Claims . . . entitled to distribution pursuant [sic] Plan." [Case No. 03-39184, Doc. # 275, ¶ 1.13]; *see Official Employment-related Issues Comm. of Enron Corp. v. Lavorato (In re Enron Corp.)*, 319 B.R. 128, 132 (Bankr. S.D. Tex. 2004) (recognizing that 1123(b)(3)(B) allows a plan to transfer avoidance and recovery powers to a party other than the debtor or a trustee when authorized by the plan to do so).

Nevertheless, Motivation argues Plaintiff lacks standing to recover the Payments under § 550(a)(1). In order to have standing to seek recovery of an avoided transfer under § 550, the recovery must be for the benefit of the estate. *Wellman v. Wellman,* 933 F.2d 215, 217-19 (4th Cir. 1991) (finding Chapter 11 debtor lacked standing under § 550 since any recovery would not be for the benefit of the estate); *Harstad v. First Am. Bank (In re Harstad)*, 155 B.R. 500, 511 (Bankr. D. Minn. 1993); *ATEK Info. Servs., Inc. v. Hartman (In re ATEK Info. Servs., Inc.*), 1994 Bankr. LEXIS 839, *13, 1994 WL 263431, *5 (Bankr. N.D. Ohio May 26, 1994). Plaintiff bears the burden of demonstrating standing. *Rosen v. Tennessee Comm'r of Fin. & Admin.*, 288 F.3d 918, 927 (6th Cir. 2002) ("The burden of establishing standing is on the party seeking federal court action").

Motivation's standing argument is twofold. First, it argues that the bankruptcy estate was not damaged or diminished by the Payments. The Payments decreased the customer promotional accounts balance; therefore, CDC would have decreased the asset purchase price by the amount of the Payments had the Payments not been made since Gerlinger's trade accounts receivable were less than the targeted $1.9 million at the time of closing. There is, however, no express statutory requirement under § 550 that the avoided transfer has damaged or diminished the bankruptcy estate and the court declines to impose such a

11

requirement.[5] Under § 550(a)(1), Plaintiff need only show that a transfer has been avoided under one of the applicable statutes, in this case § 549, and that recovery of the property or value of such property will benefit the bankruptcy estate. *Kmart Corp. v. Intercraft Co. (In re Kmart Corp.)*, 310 B.R. 107, 126-27 (Bankr. N.D. Ill. 2004).

Nevertheless, Motivation also argues that Plaintiff lacks standing under § 550 because the Payments were made out of National City's cash collateral and since National City's secured debt has not been fully satisfied, any recovery of the avoided Payments will inure to the benefit of National City only and not to the bankruptcy estate. The court finds Motivation's argument flawed in that what is at issue in this case is not the status of the cash as National City's collateral before the Payments were made but, rather, the status of any property recovered under § 550 on account of the avoided transfers. Under the Bankruptcy Code, prepetition liens do not attach to property acquired by the debtor after the commencement of the case, other than proceeds of pre-existing prepetition collateral. 11 U.S.C. § 552. And any right to recovery under § 550 as a result of the avoidance powers granted under the avoidance statutes of the Bankruptcy Code does not exist until after a bankruptcy case is commenced. Although both the first and second cash collateral orders granted National City a replacement lien on all of Gerlinger's "post-petition property and rights presently existing or hereafter arising," the orders expressly excepted "all causes of action arising under 11 U.S.C. Section[s] . . . 549 and 550," with respect to which the orders specifically state that "National City Bank shall have no lien." [Case No. 03-39184, Doc. ## 14, p.6 & 41, p.6]. Given this specific language, the court finds that National City has no security interest in any recovery in this case and that any recovery would inure to the benefit of the estate to be distributed in accordance with the Chapter 11 plan such that Plaintiff has standing to pursue recovery of the Payments under § 550.

## II. "Mere Conduit" Theory

Plaintiff seeks recovery of the Payments from Motivation as the "initial transferee" under § 550(a)(1). Motivation defends by arguing that it was a mere conduit of funds received from Gerlinger, passing the transfers on to third parties on behalf of Gerlinger and, as such, that it is not an "initial transferee" from whom Plaintiff may recover.

"Initial transferee" is not defined in the Bankruptcy Code. However, most courts, including the

---

[5] While diminution of a debtor's estate may be relevant to whether certain prepetition transfers may be avoided, such a consideration is generally in the context of determining whether the threshold requirement has been met that the transfer was of an interest of the debtor in property. *See, e.g. Mandross v. Peoples Banking Co. (In re Hartley)*, 825 F.2d 1067, 1071-72 (6th Cir. 1987) ("the diminution of estate doctrine asks whether the debtor controlled the property to the extent that he owned it and thus the transfer diminished his estate").

12

Sixth Circuit, have concluded that the term refers to something more than simply the initial recipient of funds. *Taunt v. Hurtado (In re Hurtado)*, 342 F.3d 528, 533 (6th Cir. 2003). The Sixth Circuit requires that a party have "dominion and control" over the funds in order to be an "initial transferee" under § 550(a)(1). *Id.* Mere possession of transferred funds is insufficient; there must be a transfer of ownership of the funds. *Id.* (explaining that the determination of whether a party is a "mere conduit" or an "initial transferee" turns on the distinction between mere possession and ownership of the funds); *see Christy v. Alexander & Alexander of N.Y., Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey)*, 130 F.3d 52, 58-59 (2d Cir. 1997) (finding insurance broker that took no commission was a "mere conduit" as it had no discretion or authority to do anything else but transmit the funds); *Bailey v. Big Sky Motors, Ltd. (In re Ogden)*, 314 F.3d 1190 (10th Cir. 2002) (finding that escrow agent that received funds with specific instructions directing disbursement of the funds did not have full dominion and control over funds and, thus, was not an "initial transferee").

The court finds that the evidence in this case does not support a finding that Motivation was a "mere conduit." While Motivation certainly used a portion of the Payments transferred to it by Gerlinger to pay Disney Cruise Vacations and other providers in connection with the Disney trip, it also used the Payments to pay for its out-of-pocket expenses (i.e. postage) and retained a portion as its profit on the Disney trip. Gerlinger did not expressly direct Motivation to transfer the Payments to particular individuals or entities. Motivation simply fulfilled its contractual obligations to arrange for travel and accommodations with respect to the Disney trip. In doing so, however, Motivation had discretion to apply the funds in any manner it saw fit. This is demonstrated by the fact that some of the funds were retained until after the Disney trip and applied to pay American Express and Diners Club charge accounts that had been used to pay various hotel expenses and air fares. Such discretion is also demonstrated by the fact that Gleason had authority to decide whether to deposit the Payments into Motivation's general checking account used to satisfy its obligations for client travel programs or into its money market account used to hold other funds.

That Gerlinger's contract with Motivation did not require Motivation to act as a mere conduit is further demonstrated by the manner in which they conducted business under the contract on a prepetition basis. Motivation had incurred over $12,000 in expenses relating to the Disney trip before Gerlinger made its first payment on the trip. Nearly two months of weekly payments were made before Motivation had recouped its initial outlay of funds. These payments were not made to Motivation as a conduit. Rather it was a direct beneficiary of the transfers. *See Fonda Group, Inc. v. Marcus Travel (In re Fonda Group, Inc.)*, 108 B.R. 956, 960 (Bankr. D.N.J. 1989) (finding travel agent was a direct beneficiary of the transfer and

13

not a mere conduit for funds transferred where it paid for airline tickets and was then reimbursed by the debtor); *Golden v. Guardian (In re Lenox Healthcare, Inc.)*, 343 B.R. 96, 104-05 (Bankr. D. Del. 2006) (rejecting "mere conduit" defense where defendant was required to pay employee claims first and then be reimbursed by the debtor).

Also, the contract with Disney Cruise Vacations was signed by John Gleason as Vice President of Motivation, and not as agent for Gerlinger. Had Motivation cancelled the Disney trip in December 2003 or failed to make the required payments, Motivation, not Gerlinger, would have been liable to Disney Cruise Vacations in the amount of $405 per person before December 19 and for the full cost under the contract after that date. Thus, even if it had earned no profit on the Disney trip, Motivation directly benefitted from the Payments. Under such circumstances, Motivation did not act as a "mere conduit." *See Meininger v. TMG Staffing Servs., Inc. (In re Cypress Rests. of Ga., Inc.),* 332 B.R. 60, 62-66 (Bankr. M.D. Fla. 2005) (rejecting the "mere conduit" defense where debtor reimbursed staffing agency for wages it paid in advance to staff employees because the agency's obligation to pay the employees arose regardless of whether the debtor reimbursed it; the monies reimbursed did not simply flow through to the employees).

The court concludes that Motivation exercised dominion and control over the funds such that the Payments made by Gerlinger constituted a transfer of ownership of the funds. Therefore, the court finds that Motivation is an "initial transferee" under § 550(a)(1).

### III. Equitable Estoppel

Motivation asserts equitable estoppel as an affirmative defense to Plaintiff's claims. [Doc. #2, Answer, Ninth Defense]. Equitable estoppel is an equitable doctrine invoked to avoid injustice in particular cases, *Heckler v. Community Health Servs. of Crawford County, Inc.*, 467 U.S. 51, 58 (1984), and "functions primarily to thwart a litigant from achieving an advantage by misleading another into action or inaction," Christopher Klein, Lawrence Ponoroff and Sarah Borrey, *Principles of Preclusion and Estoppel in Bankruptcy Cases*, 79 Am. Bankr. L.J. 839, 864 (Fall, 2005). Notwithstanding the statutory basis of Plaintiff's claims, the common law principle of equitable estoppel retains its viability in bankruptcy litigation. Klein, Ponoroff and Borrey, *supra* ("It is fundamental that the Bankruptcy Code silently presumes the continuing applicability of common law doctrines of preclusion and estoppel and mentions them only where modifying one of these rules."); *see Kelley v. Chevy Chase Bank (In re Smith)*, 236 B.R. 91, 99-100 (Bankr. M.D. Ga. 1999)(considering application of equitable estoppel defense in § 547 preference avoidance action); *Mestena, Inc. v. Atravasada Land and Cattle Co. (In re Atravasaada Land and Cattle Co.)*, 388 B.R. 255, 272-73 (Bankr. S.D. Tex. 2008)(applying equitable estoppel in fraudulent transfer action); *Kmart*

14

*Corp v. Uniden Am. Corp. (In re Kmart Corp.*), 318 B.R. 409, 416 (Bankr. N.D. Ill. 2004)(in a § 547 avoidance and § 550 recovery action, court finds affirmative defense of equitable estoppel is legally cognizable as a "threshold" defense to statutory cause of action, but strikes defense with leave to amend because it was not adequately factually plead by defendant); *cf. Eastern Air Lines v. Insurance Co. of Pennsylvania (In re Ionosphere Clubs, Inc.),* 85 F.3d 992, 999 (2d Cir. 1996)(applying equitable estoppel in context of assumption of executory contract under 11 U.S.C. § 365)*; In re Texaco,* 254 B.R. 536, 560-61(Bankr. S.D.N.Y. 2000)(applying equitable estoppel in context of discharge issue involving executory contracts under § 365).

In order to prevail on an equitable estoppel defense, Motivation must establish the following elements: (1) the party to be estopped must have used conduct or language amounting to a misrepresentation of material fact; (2) that party must have been aware of the true facts; (3) that party must have had an intention that the representation be acted on; (4) the party asserting estoppel must have been unaware of the true facts; and (5) the party asserting estoppel must have detrimentally and justifiably relied on the representation. *Thomas v. Miller*, 489 F.3d 293, 302 (6th Cir. 2007). Although the party to be estopped is Plaintiff, it is Plaintiff standing in the shoes of Gerlinger.

In this case, on December 5, 2003, after receiving a letter from Gleason describing the cancellation fees that would be incurred if the Disney trip was cancelled, Garris, on behalf of Gerlinger, sent Motivation a faxed response that contained an express misrepresentation that the court had approved Gerlinger's "budget for the next 4weeks (*including the Disney promo*). . . ." [Pl. Ex. 16 (emphasis added)]. Garris also faxed Motivation a copy of the budget that was approved by the court and that showed a line item labeled "Promotional expenses" for four $15,000 weekly payments. While a submitted cash collateral budget that included this line item had been approved, as the court previously determined in granting Plaintiff summary judgment on his § 549 claim, the court had not approved any specific expenses relating to the Disney trip, nor had the contract even been disclosed to the court or for that matter to Gerlinger's bankruptcy attorney. There is no question that the court's approval or disapproval of Gerlinger's payment of expenses relating to the Disney trip was a material fact relating to the contract between Gerlinger and Motivation as well as the contract between Motivation and Disney Cruise Vacations. As Garris testified, he intended that Gleason rely on the representation that the expenses had been approved, and the court finds that Gleason did in fact detrimentally rely on that representation in deciding to go forward with the Disney trip. Otherwise, Motivation could, and would, have cancelled the Disney trip before December 19 and incurred cancellation fees under its contract with Disney Cruise Vacations, the amount for which, according to Gleason,

15

Motivation was not at risk since it would have been covered by the payments that had already been made by Gerlinger prepetition. There is also no dispute that Motivation was not aware of the truth, that is, that the court had not approved payment of the Disney trip expenses. These facts satisfy the first, third, and fourth elements, as well as the detrimental reliance portion of the fifth element, of Motivation's equitable estoppel defense.

Under the second element, Motivation must demonstrate that Garris had knowledge at the time the representations were made that the representations were untrue. However, "this knowledge need not be actual but may be implied; misrepresentation made with gross negligence can form a basis for equitable estoppel." *Solow v. Northwest Airlines, Inc. (In re Midway Airlines, Inc.)*, 180 B.R. 851, 972 (Bankr. N.D. Ill. 1995); *see Hobbs v. McLean*, 117 U.S. 567, 580 (1886) (equitable estoppel is raised when there is some intended deception in the conduct or declarations of the party to be estopped, or such gross negligence on his part as to amount to a constructive fraud, by which another has been misled to his injury); *Trustees of the Michigan Laborers' Health Care Fund v. Gibbons*, 209 F.3d 587, 591 (6th Cir. 2000) ("such representations must contain an element of fraud, either intended deception or such gross negligence . . .as to amount to constructive fraud).

While Garris may have believed that the court had approved the Payments to Motivation when he informed Gleason of that fact, the court finds that Garris's misrepresentation was made with gross negligence. Gerlinger's travel incentive programs constituted its primary marketing tool and, according to Futscher, was viewed by CDC as critical to its retention of Gerlinger's customers. Knowing the importance of the travel incentive programs, and in particular the Disney trip, in maintaining Gerlinger's customer base and, therefore, their importance to CDC, Garris believed that the CDC Asset Purchase Agreement could have fallen through if the Disney trip was cancelled. Garris knew that Motivation could have cancelled the trip before December 19 and incurred cancellation fees for which Motivation would not have been at risk given the prepetition payments already made by Gerlinger. Garris, as Gerlinger's representative, had a duty to at least provide accurate information to Motivation regarding Gerlinger's ability to make the required payments. And although Garris knew that use of National City's cash collateral required court approval, Garris did not even inform Gerlinger's bankruptcy counsel of the Disney trip contract with Motivation. Having failed to do so, the court finds his representation that the court had approved the Payments to be grossly negligent.

Finally, the court finds that Motivation's reliance on Garris's representation was justified. Motivation and Gerlinger had a longstanding relationship, Gerlinger being one of Motivation's first clients

16

and Motivation handling the majority of Gerlinger's marketing for over twenty years. A certain degree of trust was reasonable with respect to communications between Garris and Gleason. Gleason was shown a four week budget that included $15,000 per week budgeted for "Promotional expenses" and was specifically told by Garris that the court had approved the Disney promotional expenses. Gleason was not otherwise involved in the cash collateral hearing and had no objective reason to question Garris's statement.

Motivation has proven each element of its equitable estoppel defense, and the court finds application of this equitable doctrine appropriate to avoid an injustice in this case, especially in light of the fact that Gerlinger's bankruptcy estate was not harmed by the Payments being made since it received a sale price from CDC that was increased dollar for dollar by the amount of the Payments. The court notes, however, that Garris represented only that $60,000 of the Disney trip payments had been approved by the court but actually paid Motivation $66,506.44. The court, therefore, concludes that equitable estoppel precludes Plaintiff's recovery of the Payments only to the extent of $60,000 but not as to the balance of $6,506.44.

## CONCLUSION

For the foregoing reasons, judgment will be entered on Plaintiff's claim for recovery under 11 U.S.C. § 550 in the amount of $6,506.44. A separate judgment in accordance with this Memorandum of Decision will be entered.